**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANDREW SOJKA,<br>*Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. 2:26-cv-8072 |
| MARK MASCARI, MD,<br>*Defendants*. | ) | **JURY TRIAL DEMANDED** |

**<u>COMPLAINT</u>**

Plaintiff Andrew Sojka, by his attorneys at the Mizner Law Firm, files this Complaint and states as follows:

**A. <u>Parties.</u>**

1. Plaintiff Andrew Sojka is an adult individual who is currently incarcerated at the State Correctional Institution at Phoenix ("SCI Phoenix"), located at 1200 Mokychic Drive, Collegeville, Pennsylvania 19426.

2. Defendant Mark Mascari, MD, is an adult individual who at all relevant times was the medical Utilization Reviewer at SCI Phoenix, located at 1200 Mokychic Drive, Collegeville, Pennsylvania 19426. At all relevant times, Dr. Mascari was acting under color of state law, and a professional negligence claim is being asserted against him.

**B. <u>Jurisdiction and Venue</u>**

3. This Complaint includes claims made pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983.

4. This Honorable Court has jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

5. This Complaint also includes pendent state law claims, over which this Honorable Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within the territorial jurisdiction of this District and the Defendants are subject to personal jurisdiction within this District.

## C. <u>Facts</u>

7. A hernia is defined as an organ or other tissue being forced through a weak spot in the abdominal wall. A hernia is known as “inguinal” when intestines, fat or other tissue contents of the abdomen enter into the groin area, where the lower abdomen meets the inner thigh. Throughout the course of a hernia, tissue may recede back into the abdomen and then bulge out again, depending on a number of factors including body position and activity levels.

8. Inguinal hernias are the most common type of hernia. Inguinal hernias can cause severe pain in men if the internal tissue is forced into the scrotum and impacts the testicles.

9. Hernias impacting the groin area (i.e., inguinal and femoral hernias) are very common—the prevalence of groin hernias has been estimated to be between five and ten percent (5-10%) in the United States.

10. The estimated lifetime risk of developing a groin hernia is about twenty-five percent (25%) in men.

11. Inguinal hernias can cause severe pain. The level of pain usually increases during and/or after activity or exertion.

12. Typically painless and ordinary activities of daily living such as walking, running, lifting, coughing, urinating, defecating, or even sitting up can cause herniated tissue to bulge out of the abdominal wall, causing intense and excruciating pain.

13. Hernias may become so painful that they prevent patients from engaging in any activities, even leaving a suffering patient bedridden.

14. Other symptoms of inguinal hernias include weakness, feelings of heaviness, burning, tearing, or aching in the groin; or a swollen or enlarged scrotum.

15. A hernia that is left without surgical repair can cause serious complications.

16. One of the most serious hernia complications is when the intestines bulge through the abdominal wall and become trapped in the scrotum, or outside the abdominal wall.

17. This condition is a medical emergency which can lead to bowel obstructions, tissue necrosis, sepsis, the excision of intestines, and even death.

18. Although a larger hernia may visually appear "worse," in fact there is no correlation between hernia size, and the amount of pain it can cause.

19. A patient may experience much more pain with a small hernia than a large hernia, or vice versa.

20. A hernia that can be "pushed back" into the body is referred to as "reducible." Many times, however, the bulging tissue of the hernia becomes trapped and cannot be pushed back into place—this is a non-reducible, or "incarcerated" hernia.

21. Reducible hernias can be even more painful than non-reducible hernias. Hernias may be reducible at times and non-reducible at others, and a reducible hernia can become permanently non-reducible, or "incarcerated," at any time.

22. An inmate with a hernia may face unique challenges. For example, there are times when an inmate simply does not have the freedom to lie down on the ground to push his intestines back into place. This can become necessary at any time for a patient with a hernia, whenever the hernia bulges out of the abdominal wall.

23. If an incarcerated hernia is untreated, it can at any time become "strangulated," meaning the blood supply to the bulging tissue is cut off, causing the tissue to die. When this happens, the tissue dies.

24. Strangulation is an emergency situation, requiring immediate surgery to correct the condition.

25. Failure to treat a strangulated hernia can lead to severe infection, intestinal obstruction, the excision of intestines, and death.

26. Hernias are usually diagnosed with a physical exam, in conjunction with a review of the patient's medical history. X-rays, CT scan, or ultrasound testing may be helpful, but are not conclusive - a negative scan does not mean that no hernia is present.

27. A hernia belt, or truss, can temporarily relieve hernia discomfort if it fits properly. It does not heal the hernia. It does not eliminate the risk of strangulation.

28. Most patients find a truss unsatisfactory and do not wear them.

29. The ***only*** treatment that can correct an inguinal hernia is surgical repair.

30. The tear or weakness in the abdominal wall which permits the tissue to bulge through cannot heal on its own. Therefore, a patient will continue to suffer from intense pain, discomfort, and limited activity until corrective surgery is performed.

31. Failing to provide corrective surgery also leaves a patient vulnerable to other complications, including the risk of infection, intestinal obstruction, and death.

32. The risk of developing complications increases the longer a hernia is left untreated.

33. The correct first step in hernia treatment is referral to a surgeon for consultation. Corrective surgery is generally recommended for patients with hernia who are experiencing any of the following symptoms: pain, an inability to walk, an inability to work or engage in other normal life activities, or other symptoms.

34. The medical standard of medical care for symptomatic hernias is surgical repair.

35. This surgery should be conducted as soon as possible after the hernia is detected.

36. Basing the decision to perform surgery on whether the hernia is reducible, irrespective of other symptoms, falls far below accepted medical practice and the standard of care.

37. Surgical repair of inguinal hernias is one of the most common surgeries performed in the United States, and it is a relatively simple procedure.

38. More than one million abdominal wall hernia repairs are performed each year in the United States, with inguinal hernia repairs constituting nearly 770,000 of these cases.

39. Although hernia surgery is typically referred to as "elective," that designation has no bearing on whether the condition it will alleviate is a serious medical need.

40. Any procedure that is not an emergency can be classified as elective.

41. An elective surgery only means there is sufficient time to schedule the surgery as opposed to going into surgery immediately on an emergent basis; this does not mean that failure to perform the surgery is not below the standard of care, indeed it is, and it does not mean the condition will not result in severe pain and other serious complications, because it can.

**Mr. Sojka suffered due to inadequate medical care.**

42. Mr. Sojka was incarcerated at SCI Phoenix at all times relevant to this Complaint.

43. As such, he was and is completely dependent upon the medical staff to provide him with necessary medical care; he has no ability to obtain such care himself.

44. On February 14, 2024, Mr. Sojka was seen by PA Elliott Yodh in the prison medical department, reporting that he felt a bulge in his stomach which had occurred while he was working out.

45. The bulge enlarged when he defecated or coughed, which PA Yodh observed.

46. PA Yodh assessed him with a left inguinal hernia, provided him an abdominal binder, and submitted an ultrasound consultation.

47. The request was reviewed and approved by Dr. Anthony Letizio, the site medical director, on February 19, 2024.

48. The ultrasound was scheduled for April 30, 2024.

49. On February 20, 2024, Mr. Sojka presented to PA Yodh again, because his abdominal binder was not effective, and was rising above his hernia site every time he walked. He returned the binder, and was issued a surgical truss.

50. On February 26, 2026, Mr. Sojka presented to Ashley Senkowski, CRNP in the medical department, reporting ongoing constipation and urinary issues.

51. CRNP Senkowski wrote, "Last bowel movement was six days ago. Reports it feels like he is unable to urinate at times. Also with complaints of growing left inguinal hernia."

52. She observed a golf-ball sized hernia while he was lying down, and prescribed Miralax and Senna for his constipation, noting that an ultrasound had already been ordered and scheduled.

53. On April 10, 2024, Mr. Sojka reported to Stephanie O'Neill, RN, that his hernia was "almost down to my balls."

54. On April 23, 2024, Mr. Sojka was seen by Susan Miller, CRNP, who noted he was having difficulty urinating, with poor urinary stream and urinary urgency. Her treatment plan was for Tamsulosin, a medication to treat prostate related urinary issues.

55. CRNP Miller added an addendum to her note: "appropriate personnel notified regarding hernia repair surgery - was cancelled and will need to be rescheduled."

56. It is not clear what CRNP Miller meant by this addendum, as there is no other note indicating that Mr. Sojka had been either scheduled for surgery, or that his surgery had been canceled.

57. Indeed, to that point he had never even seen a surgeon for his hernia, much less been scheduled for the procedure itself.

58. On April 30, 2025, Mr. Sojka underwent an ultrasound which confirmed his left inguinal hernia.

59. On June 21, 2024, he saw CNRP Miller, who noted his hernia was going further into his scrotum and causing more pain especially when getting out of bed in the morning.

60. CNRP Millers' treatment plan was to enter a consultation request for general surgery.

61. Site medical director Dr. Letizio reviewed her consultation request on June 24, 2024. However, there is no indication the consult was ever approved.

62. Instead, on the consultation record, an unsigned note was added on June 28, 2024: "Please perform conservative treatment measures, document objective evidence of hernia." This unsigned note was added with the descriptor "ATP," meaning "alternative treatment plan."

63. Dr. Letizio has subsequently testified this “alternative treatment plan” was likely written by Dr. Mark Mascari, the medical company’s utilization reviewer.

64. Dr. Letizio testified regarding Dr. Mascari and the unsigned “alternative treatment plan”: “So he may have done this after it was put in after I approved it, but I could not think of anybody else that would have done this.”

65. According to Dr. Letizio, Dr. Mascari had been hired to “educate us of the appropriate consult and not appropriate consult. In my opinion, it was probably -- it probably was a cost-saving thing….”

66. Dr. Letizio explained that Dr. Mascari’s role was to double check the care the site medical providers were ordering: “his job was to kind of prevent weaker doctors or providers from ordering unnecessary tests or ordering the appropriate test, just to help.”

67. Dr. Letizio has testified that there were a number of problems with Dr. Mascari’s “alternative treatment plan”:

a. It should have been signed by the plan’s author, but was not;

b. There was already objective and documented evidence of a hernia in the medical record, in the form of the ultrasound results, and physical observations by medical providers;

c. Dr. Letizio testified regarding the “alternative treatment plan,” “I honestly don't know what that person was wanting, because there was -- to me -- clear indication that there was evidence” of the existence of the hernia;

d. Dr. Letizio testified that because Dr. Mascari’s “alternative treatment plan” was unsigned, no provider at SCI Phoenix should have followed it;

e. Dr. Letizio testified that "in a hernia-type situation, the conservative treatment measures is, you know, in my opinion not, you know, very efficient," because a patient with a hernia needs to be sent to a surgeon; and

f. Dr. Letizio explained that therefore, Dr. Mascari's involvement and alternative treatment plan did not improve the care which Dr. Letizio had ordered.

68. Nonetheless, Mr. Sojka's subsequent medical records at SCI Phoenix make clear that despite these deficiencies, Dr. Mascari's "alternative treatment plan" was adopted and implemented by the medical staff, causing months of additional delay.

69. On August 25, 2024, Mr. Sojka was seen by CRNP Senkowski at his cell door, for complaints for ongoing hernia pain. The visit deteriorated as Mr. Sojka was extremely frustrated and upset about being offered an "alternative treatment plan" for his hernia.

70. CRNP Senkowski recorded under the "plan" portion of her SOAP note:

> Patient was yelling and cursing at the provider, stating there is no alternative treatment for hernias. Informed the patient that he had been given Miralax and Senna as an alternative treatment. The patient began yelling and told the provider those medications do not work as an alternative.

71. While Mr. Sojka's language to CRNP Senkowski was unacceptable, his frustration and anger was real and completely justified: from a medical standpoint, there is no such thing as an "alternative treatment" for an inguinal hernia, and Dr. Mascari's refusal to approve him for a surgical consultation was unacceptable and inexcusable.

72. On September 16, 2024, Mr. Sojka was seen at his cell door by CRNP Senkowski, who noted his inguinal hernia was "squeezing and twisting" his testicle.

73. She wrote, "has been using conservative treatment, including Miralax and senna, stating these medications are not effective, reported compliance. General surgery consult was ATP'd in June 2024 to evaluate effectiveness of conservative measures."

74. Even through the cell door CRNP Senkowski was able to see the mass in Mr. Sojka's left groin, and noted "appears to be larger than the 2.7 cm hernia identified on ultrasound in May 2024. The patient is unable to reduce hernia."

75. Therefore, her treatment plan was to "discuss with the Site Medical Director possible general surgery consultation due to the non-effectiveness of conservative treatment options. Will order Voltaren" a pain and inflammation medication.

76. CRNP Senkowski's note again confirms that Mr. Sojka's care had been delayed because of Dr. Mascari's decision in June not to proceed with a surgical consultation in June, in favor of using "alternative treatment."

77. Her note makes clear that, despite Dr. Letizio's testimony that no one should have been following the unsigned alternative treatment plan, in fact Dr. Mascari's treatment plan had been adopted by the medical staff and was the reason Mr. Sojka's surgical consult was not scheduled in June.

78. On September 17, 2024 - seven months after the inguinal hernia was originally diagnosed, and three months after CRNP Senkowski first submitted a surgical consultation request - she submitted a new general surgery consultation request, which was approved by Dr. Letizio that same day, and finally by Dr. Mascari on September 19, 2024.

79. However, the consultation was not actually scheduled for four more months, until January 3, 2025.

80. On October 24, 2024, CRNP Miller noted that Mr. Sojka was having hernia pain, and that it was difficult for him to work in the kitchen due to the hernia.

81. As a result, CRNP Miller put him on a work restriction for four months.

82. On November 19, 2024, Dr. Pinky Bora Saikia put an addendum in Mr. Sojka's medical chart: "pending surgical evaluation for inguinal hernia - office made aware verbally about the need to schedule."

83. This addendum indicated that more than two months since Dr. Letizio approved the surgical consultation, it had not yet been scheduled.

84. On January 14, 2025, Dr. Letizio referred Mr. Sojka for general surgery to repair the inguinal hernia, noting,

> Inmate with left groin hernia confirmed by General Surgeon and Urology that initially went into the inguinal canal and then down into the scrotum. The hernia is now getting larger with complaints of constipation and difficulty urinating from time to time. He is able to push the hernia back at time which helps him deal with the pain. Inmate now with fullness in the left tesicle where the hernia sac ends. The inmate is scheduled for the surgery with general surgery and urology being present to complete the procedure. Asking for approval of the surgery.

85. Dr. Mascari approved the referral to general surgery that same day, eleven months after the hernia was first diagnosed.

86. However, the hernia repair was not scheduled for several months, and did not take place until May 22, 2025, with Dr. Shermer, over five months after it was first approved by Dr. Mascari.

87. Mr. Sojka underwent surgery on May 22, 2025, which successfully repaired the hernia without incident.

88. He was discharged from the prison infirmary back to his housing unit on May 23, 2025.

89. In sum, it took over fifteen months from the time Mr. Sojka's hernia was diagnosed, until it was finally repaired, in part due to the unjustified and unreasonable delay caused by Dr. Mascari's insistence that he undergo an "alternative treatment plan" which was in

complete violation of the standard of care, and which has been directly criticized by the other medical doctor at SCI Phoenix, Dr. Letizio.

90. Dr. Mascari's decision to delay surgical consultation and repair of Mr. Sojka's hernia, was despite his knowledge that surgery was the only appropriate treatment for his injuries.

**Exhaustion of Administrative Remedies.**

91. On March 28, 2025, Mr. Sojka submitted a grievance against his medical providers, writing in part:

> I was diagnosed with a hernia late Feb early March of 2024. The medical dept. Here at SCI PHX blatantly lied to me about treatment for (7) seven months claiming that they were going to try "alternative methods" to fix my hernia. There was not 1 time during those 7 months that I saw a doctor nor was there any treatment. Nothing was done despite all the sick calls & requests. In my opinion, they were hoping I got paroled in Aug. of 24 so they didn't have to deal with it…. The Dr. at Einstein explained to me that there's no such thing as an alternative fix, joking "maybe prayer or a miracle."

92. On April 7, 2025, Mr. Sojka's grievance was denied by the grievance coordinator, who wrote "You currently have a pre-operative consult appointment scheduled for the surgery. In light of this information, your grievance is denied and all request for relief is denied."

93. In other words, Mr. Sojka's grievance was denied on the grounds he already had a consultation scheduled, when in reality that consultation was the result of a mistake: he had already been approved for surgery, but instead had been scheduled for simply another consultation!

94. Mr. Sojka timely appealed, but his appeal was denied by the Facility Manager on May 5, 2025, on the basis that "you have not provided evidence to substantiate your claims. A consult is scheduled in the near future."

95. Mr. Sojka timely appealed again, and received a final denial of his grievance from SOIGA on June 25, 2025.

96. As such, Mr. Sojka has exhausted his administrative remedies, and his claims are ripe for adjudication by this Honorable Court.

97. The statute of limitations on Mr. Sojka's claims were tolled until he received the final denial from SOIGA on June 25, 2025, and thus his claims against Dr. Mascari are timely filed.

## COUNT I - DELIBERATE INDIFFERENCE IN VIOLATION OF THE EIGHTH AMENDMENT

*Andrew Sojka*
*v.*
*Mark Mascari, MD*

98. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

99. Dr. Mascari knew of Mr. Sojka's serious medical needs.

100. Despite this knowledge, Dr. Mascari intentionally denied Mr. Sojka individualized care and intentionally delayed treatment that was necessary to address his serious medical needs.

101. Dr. Mascari intentionally denied Mr. Sojka timely referral to a surgeon for non-medical reasons; namely, as a cost-saving measure.

102. In addition, Dr. Mascari intentionally denied Mr. Sojka timely referral to a surgeon, opting for "an easier and less efficacious treatment" of his condition; namely, an "alternative treatment plan" of laxatives.

103. Dr. Mascari caused wanton infliction of pain and thus exhibited deliberate indifference to the serious medical needs of Mr. Sojka, in violation of the Eighth Amendment.

104. By denying Mr. Sojka individualized care and treatment of his hernia consistent with the medical standard of care, Dr. Mascari has imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

105. Dr. Mascari's failure to timely provide Mr. Sojka's medically-necessary hernia surgery violates all standards of decency, contrary to the Eighth Amendment.

WHEREFORE, Plaintiff Andrew Sojka seeks judgment in his favor and against Dr. Mark Mascari in an amount in excess of $75,000, along with all other relief permitted by law.

## COUNT II
## PROFESSIONAL NEGLIGENCE

*Andrew Sojka*
*v.*
*Mark Mascari, MD*

106. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

107. As Mr. Sojka's treating medical provider, Dr. Mascari owed a duty of care to Mr. Sojka to ensure that he was referred for a surgical consultation, and provided corrective surgery if recommended by the examining surgeon.

108. Another aspect of this duty was to provide Mr. Sojka with the minimum standard of care required for someone in his condition and with his medical needs.

109. The standard of care for someone in Mr. Sojka's condition is to be referred to a surgeon for a consultation, and to follow the recommendation of the surgeon which is usually to surgically repair the inguinal hernia.

110. Dr. Mascari failed and refused to ensure Mr. Sojka was referred to a surgeon for a consultation and to follow the recommendation of the surgeon in a timely manner.

111. As set forth above, the medical care, diagnosis, treatment and services rendered by Dr. Mascari was performed in a negligent and careless manner and not in accordance with professional standards required of the conditions presented by Mr. Sojka.

112. Dr. Mascari failed to possess and/or exercise adequate medical skills, knowledge, experience and techniques for the proper treatment of Mr. Sojka.

113. As a direct and proximate result of the negligence by Dr. Mascari, Mr. Sojka has continued to suffer severe injury and pain for far longer than his condition otherwise required.

114. As a direct and proximate result of the negligence by Dr. Mascari, Mr. Sojka has experienced pain and suffering and loss of life's pleasures.

115. As a direct and proximate result of the negligence by Dr. Mascari, Mr. Sojka has experienced pain and suffering, inconvenience, limitation on activities of daily living, mental anguish, and humiliation and embarrassment.

WHEREFORE, Plaintiff Andrew Sojka seeks judgment in his favor and against Dr. Mark Mascari in an amount in excess of $75,000, along with all other relief permitted by law.

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ Joseph P. Caulfield, Esq.

Joseph P. Caulfield
PA Bar No. 322823
jpc@miznerfirm.com

311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889

*Attorney for the Plaintiff*